UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Roberto Lopez,

        Plaintiff,                         Case No. 22-cv-0940

v.

3M Company and                       **NOTICE OF REMOVAL**
Aearo Technologies LLC,

        Defendants.

Defendant 3M Company ("3M") hereby gives notice of removal of this action, pursuant to 28 U.S.C. §§ 1441, 1442(a)(1), and 1446, to the United States District Court for the District of Minnesota, with the consent of its co-Defendant Aearo Technologies LLC.[1]

This case is one of hundreds of lawsuits filed in Minnesota state court by current or former servicemembers against 3M and Aearo alleging injuries caused by Combat Arms™ Earplugs, Version 2 ("CAEv2"), all of which have been removed to the District Court of Minnesota and transferred to a Multidistrict Litigation Court ("MDL Court") in the Northern District of Florida. *See In re 3M Combat Arms Earplug Prod. Liab. Litig.* ("*In re 3M*"), No. 3:19-md-2885, 2020 WL 365617 (N.D. Fla. Jan. 22, 2020); *see also In re 3M*, No, 3:19-md-2885, 2020 WL 5835311, at *1 (N.D. Fla. Oct. 1, 2020). The MDL Court has

---

[1] 3M acquired Aearo Technologies, Inc. ("Aearo") in 2008. After acquiring Aearo in 2008, 3M continued to sell CAEv2. Aearo Technologies LLC, named in the Complaint, is a different entity from Aearo. Nonetheless, it consents to this removal.

denied remand for each of the cases transferred to the MDL. *Id*. 3M intends to assert the federal government contractor defense. Because Plaintiff's injuries admittedly arise from use of military-issued CAEv2, the decision in *Graves* is binding and 3M is entitled to remove this action under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), to have its federal defenses adjudicated in a federal forum. *Graves*, 17 F.4th at 773.

3M also intends to assert the combatant activities defense. Because Aearo sold CAEv2 to the U.S. military under government contracts and in accordance with the military's rigorous specifications, this federal defense provides an additional basis for removal jurisdiction under the federal officer removal statute. Such removal also "fulfills the federal officer removal statute's purpose of protecting persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 133 (2d Cir. 2008) (*citing Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 127 (2007))..

Separately, this action is also removable because Plaintiff seeks to hold 3M liable for alleged injuries that occurred at federal enclaves or territories subject to the exclusive jurisdiction of the United States in relation to Plaintiff's military service. While Plaintiff's complaint does not identify the location of Plaintiff's alleged injury, those locations are almost certainly "federal enclaves" for jurisdictional purposes. "Federal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves.'" *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006). Because Plaintiff's claims arose, at least in part, at federal enclaves, the claims involve a federal question, and 3M may remove this action under 28 U.S.C. § 1441(a).

Removal is timely because this action was served on 3M on March 31, 2022. Venue is proper pursuant to 28 U.S.C. §§ 103 and 1442(a) because the Fourth Judicial District is located within this District. Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served upon counsel for Plaintiff, and a copy is being filed with the Clerk of the Fourth Judicial District.

## BACKGROUND

The CAEv2 is an earplug with two insertable ends developed specifically for the needs of the U.S. military for use as hearing protection in noisy environments. CAEv2 has a yellow end and green end. Each end has a different purpose. When the yellow end of the earplug is inserted, users can still hear nearby low-level sounds, like verbal communication, but receive protection from high-level impulse noise, like gunfire. In contrast, when the green end of the earplug is inserted, CAEv2 acts like a traditional earplug, providing steady and continuous protection from both ambient and impulse noise.

In the area of national defense, the U.S. military relies on close collaboration with private contractors to design and develop products, such as the CAEv2, and manufacture and supply those products in accordance with highly particular specifications balancing the multitude of operational and budgetary needs of equipping the nation's fighting forces. This litigation involves a classic example of that military-contractor collaboration.

CAEv2 was designed at the request of and in consultation with military audiologists, including Dr. Doug Ohlin. At that time, Ohlin served in the capacity of Program Manager, Hearing Conservation, U.S. Army Center for Health Promotion and Preventive Medicine (USACHPPM). Ohlin and his program gave direction to Aearo to ensure that the CAEv2

3

would meet the military's needs. For example, Ohlin proposed the inclusion of the filter that was a key updated feature of the CAEv2. Ohlin also specifically directed Aearo to shorten the CAEv2 so that it would be compatible with soldiers' headgear and would fit into a military-issued carrying case. Ohlin was also involved in Aearo's testing of the CAEv2.[2]

Following the development of the product, Ohlin was involved in the ultimate approval of CAEv2 for military use and proposed purchasing CAEv2 to the Joint Readiness Clinical Advisory Board. The military's specifications for the CAEv2 reflect the design direction that Ohlin and his program gave to Aearo. In particular, these specifications are memorialized in a Medical Procurement Item Description (MPID) that was used by the Defense Logistics Agency (the U.S. military's purchasing authority) in soliciting bids from Aearo for the CAEv2. The MPID specified "military unique, double-ended ear plugs suitable for use as hearing protectors for military personnel in chronically noisy environments" that should "be designed to provide protection from the unique noises created by military firearms, while allowing the wearer to clearly hear normal speech . . . such as voice commands, on the battlefield" and should be "camouflage green or another suitable dark color."

Moreover, the military was in charge of training and instructing servicemembers on the proper use of CAEv2. The government initially instructed Defendants to ship the

---

[2] Ohlin's involvement continued following the military's decision to purchase and deploy the CAEv2. He provided Aearo with feedback from military personnel as to using the CAEv2 and developed training and instructions for military personnel.

4

CAEv2 *without* instructions because Ohlin felt that personal training was the most effective way to train military soldiers. Accordingly, military audiologists took on the responsibility of individually training every soldier. Indeed, in-person fit and training was *required* by DOD policy. Beginning at least as early as 2001, Ohlin gave the following instruction to military audiologists on how to fit the CAEv2: "if you needed to, you could fold back the flanges on the earplug to get a good fit." In 2004, the military created its own written training materials for the CAEv2 which included a "wallet card" that could be distributed to service members at the time they were fitted with the earplug and a two-page overview. Both of these materials included instructions to fold back the flanges if needed. In sum, the CAEv2 was launched at the request of, and designed in close coordination with, the U.S. military. The U.S. military was also responsible for training servicemembers on using the CAEv2, instructing Defendants to ship the product without instructions.

In sum, the CAEv2 was launched at the request of, and in close coordination with, the U.S. military. The CAEv2's design reflects the direction and feedback of individuals acting on behalf of the U.S. military. The U.S. military purchased the CAEv2 and issued it to servicemembers like Plaintiff precisely because the CAEv2 accomplishes the military's goal of balancing hearing protection with operational needs.

## BASES FOR FEDERAL JURISDICTION AND REMOVAL

**I.    REMOVAL IS PROPER UNDER THE FEDERAL OFFICER REMOVAL STATUTE.**

Removal is proper under 28 U.S.C. § 1442(a)(1), which provides for removal when a defendant is sued for that occurred at least in part "*because of* what they were asked to

do by the Government." *Isaacson*, 517 F.3d at 137. Removal rights under this section are much broader than under the general removal statute, 28 U.S.C. § 1441. Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999). This is because Section 1442 protects "the government's need to provide a federal forum for its officers and those who are 'acting under' a federal office." *Albrecht v. A.O. Smith Water Prod.*, No. 11 Civ. 5990 (BSJ), 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011). This important federal policy "should not be frustrated by a narrow, grudging interpretation of s 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).

  The removing defendant must establish that: (1) the defendant is a "person" under the statute; (2) the defendant was "acting under" the direction of a federal officer when it engaged in the allegedly tortious conduct; (3) the defendant was acting "under color of" federal office at the time of the allegedly tortious conduct; and (4) the defendant raises a "colorable" federal defense. *See Mesa v. Cal.*, 489 U.S. 121, 124-25, 129-31, 134-35 (1989); *Jacks v. Meridian Res. Co., LLC*, 701 F.3d 1224, 1230 (8th Cir. 2012). All requirements for removal under § 1442(a)(1) are satisfied here. *Cf., e.g., In re 3M*, 2020 WL 365617 at *1; *Ayo v. 3M Co.*, No. 18-CV-0373 (JS)(AYS), 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018) (denying motion to remand and finding that federal officer removal was proper in case where product liability was sought for defendants' product's conformance with military specifications).

### A. The "Person" Requirement Is Satisfied.

The first requirement for removal under Section 1442 is satisfied because 3M is a "person" under the statute. "[T]he 'person' contemplated by the federal officer removal statute includes corporations." *Jacks*, 701 F.3d at 1230.

### B. The "Acting Under" Requirement Is Satisfied.

To satisfy the second requirement ("acting under" a federal officer) "a private person's actions 'must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior.'" *Id*. (holding that health insurer contracted by U.S. Office of Personnel Management was "acting under" a federal officer) (quoting *Watson*, 551 U.S. at 152). "The words 'acting under' are to be interpreted broadly." *Isaacson*, 517 F.3d at 136. Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained-of conduct was done at the specific behest of the federal officer or agency." *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 813 (3d Cir. 2016); *see also Jacks*, 701 F.3d at 1230 (although "not limitless, '[t]he words "acting under" are broad,' and the Supreme Court 'has made clear that the statute must be "liberally construed."'") (quoting *Watson*, 551 U.S. at 147). In 2011, Congress amended the officer removal statute to expand its application to defendants "sued in an official or individual capacity for *or relating to* any act under color of such office." Removal Clarification Act of 2011, Pub. L. No. 112-51, § 2(b)(1)(A), 125 Stat. 545 (emphasis added). Since then, four circuits "have concluded that, in the Removal Clarification Act, Congress broadened federal officer removal to actions, not just causally connected, but alternatively connected or associated, with acts under color of federal office." *Baker v. Atl. Richfield Co.*, 962 F.3d

7

937, 943 (7th Cir. 2020) (quotation omitted) (citing opinions from the Fifth, Fourth, and Third Circuits.)

The "acting under" requirement is met here because Plaintiff directly challenges Defendants' alleged conduct in designing and providing vital products "that, in the absence of Defendants, the Government would have had to produce itself." *Isaacson*, 517 F.3d at 137. The military directed and approved the design of the CAEv2, including its length, and created the training protocols and materials for using the CAEv2. Defendants were thus "acting under" a federal officer when they designed and manufactured the CAEv2 at the direction of the U.S. military to meet the military's specific needs to provide hearing protection. *See, e.g.*, *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012) (holding that defendant was "acting under" a federal officer because it "worked hand-in-hand with the government, assisting the federal government in building warships. 'Acting under' covers situations, like this one, where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete."); *Isaacson*, 517 F.3d at 137 ("Defendants contracted with the Government to provide a product that the Government was using during war—a product that, in the absence of Defendants, the Government would have had to produce itself."). Even more, the military's involvement went beyond merely establishing standards. Its involvement also included such operational features as ensuring the CAEv2 would fit in military-issued containers. Such involvement is quintessential activity "acting under" a federal officer. *See e.g. Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th Cir. 1998) (authorizing removal of a tort suit against private defense contractors that manufactured Agent Orange); *Gordon v. Air &*

8

*Liquid Sys. Corp.*, 990 F. Supp. 2d 311, 320 (E.D.N.Y. 2014) (contractor was "acting under" a federal officer for purposes of removal statute when it provided products used in construction of ships to Navy's precise specifications). The "acting under" requirement is separately met because Plaintiff's claims relate to the instructions or warnings that the military required Defendants to provide (or not provide) along with the CAEv2 when packaged for military use. "[E]vidence that the military required its purchases of CAEv2 earplugs to be sent without instructions/warnings and that the military developed its own instructions issued on wallet cards to service members" satisfies the "acting under" element for removal under Section 1442(a)(1). *Graves*, 764 F.4th at 770.

### C. The "Causation" Requirement Is Satisfied.

The third prong that a defendant's actions were taken "under color of federal office . . . has come to be known as the causation requirement." *Isaacson*, 517 F.3d at 137 (internal quotation marks, alterations, and citation omitted). Like the "acting under" requirement, "[t]he hurdle erected by this requirement is quite low." *Id.* Courts "credit Defendants' theory of the case when determining whether [this] causal connection exists." *Isaacson*, 517 F.3d at 137 (*citing Acker*, 527 U.S. at 431-32 (1999) ("demanding an airtight case on the merits in order to show the required causal connection" would "defeat the purpose of the removal statute")).[3] In 2011, Congress further expanded Section 1442 by amending

---

[3] The "acting under" and "under color of" prongs overlap. Both "are satisfied if the actions subject to suit resulted directly from government specifications or direction." *Albrecht*, 2011 WL 5109532, at *5; *Graves*, 17 F.4th at 769 ("[T]he causal connection element is closely related to the 'acting under' element when the party seeking removal is not itself a federal officer.").

section 2(b) to permit removal "for *or relating to* any acts under color" of federal office, so as "to broaden the universe of acts that enable Federal officers to remove to Federal court." H.R. REP. 112-17, 6, 2011 U.S.C.C.A.N. 420, 425 (emphasis showing addition).

"To show causation, Defendants must only establish that the act that is the subject of Plaintiffs' attack . . . occurred *while* Defendants were performing their official duties." *Isaacson*, 517 F.3d at 137-38 (emphasis in original). Here, Plaintiff's claims arise from Defendants' production and sale of CAEv2 to the specifications approved by the military. Plaintiff alleges that the design of the CAEv2 is defective and that the instructions for the CAEv2 were inadequate. Aearo developed and designed the Combat Arms™ earplugs, including establishing its length, at the direction of federal officers.

Further, even if Plaintiff was to prove that any alleged defect was the result of an act not specifically contemplated by the government contract, "it is enough that the contracts gave rise" to the harm alleged. *Id*. at 138. "[W]hether the challenged act was outside the scope of Defendants' official duties, or whether it was specifically directed by the federal Government, is one for the federal—not state—courts to answer." *Id.* (*citing Willingham*, 395 U.S. at 409.). The Eighth Circuit has addressed this precise activity in another case, and found that 3M presented "sufficient evidence to satisfy the 'acting under' and 'causal connection' elements of removal under § 1442(a)(1)." *Graves*, 17 F.4th at 770.

### D. The "Colorable Federal Defense" Requirement Is Satisfied.

The fourth requirement (establishing a "colorable federal defense") is satisfied by 3M's assertion of the government contractor defense and the combatant activities defense. Courts around the country have held that the government contractor defense and the

10

combatant activities defense support removal under § 1442(a)(1). *See, e.g.*, *Jacks*, 701 F.3d at 1234-35 (government contractor defense supports removal under § 1442); *Isaacson*, 517 F.3d at 139 (same); *Zeringue v. Crane Co.*, 846 F.3d 785 (5th Circuit 2017) (same); *McMahon v. Presidential Airways, Inc.*, 410 F. Supp. 2d 1189, 1200 (M.D. Fla. 2006) (both government contractor defense and combatant activities defenses supported removal under Section 1442); *Graves*, 17 F.4th at 773 ("[W]e conclude that 3M has a colorable federal contractor defense for claims made by . . . plaintiffs who acquired CAEv2 earplugs through the military, and has satisfied the other elements required for § 1442(a)(1) removal.").

A defendant need not prove its defense at the removal stage; a defendant need only show that a federal defense is "colorable." *Jacks*, 701 F.3d at 1235. Courts will not "require that these defenses be clearly sustainable in order to support removal under § 1442(a)(1)." *Id.* (*citing Willingham*, 395 U.S. at 406–07 ("[The federal officer removal statute] is broad enough to cover all cases where federal officers can raise a colorable defense. . . . The officer need not win his case before he can have it removed.").)

At the removal stage, the inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Cuomo v. Crane Co.*, 771 F.3d 113, 116 (2d Cir. 2014) (citing *Kircher v. Putnam Funds Trust*, 547 U.S. 633, 644 n. 12 (2006)).[4] Moreover, "this inquiry is undertaken whilst viewing the facts in the light most

---

[4] *See also Kraus v. Alcatel-Lucent*, Civil Action No. 18-2119, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court does not 'determine credibility, weigh the quantum of

favorable to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783-84 (E.D. Pa. 2010). "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should 'have the opportunity to present [his] version of the facts to a federal, not a state, court.'" *Cuomo*, 771 F.3d at 116 (quoting *Willingham*, 395 U.S. at 409).

### 1. 3M Has a Colorable Government Contractor Defense.

Under the government contractor defense, the defendant is not liable for alleged defects or negligence with respect to military equipment or supplies "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512. The Eighth Circuit has held that this defense extends to failure-to-warn claims for the exact product at issue here. *Graves*, 17 F.4th at 772 ("Like the district court, we conclude this is a 'logical expansion of *Boyle* [*v. United Techs. Corp.*, 487 U.S. 500 (1988)] and therefore the federal contractor defense applies to failure-to-warn claims.") (quotation omitted)

3M has satisfied all of these elements for purposes of this removal. The MDL Court has evaluated the evidence discussed above twice and, on both occasions, determined that it was sufficient to show a colorable government contractor defense regarding at least

---

evidence or discredit the source of the defense' at this stage. Instead, [the court] only determines whether there are sufficient facts alleged to raise a colorable defense.").

design defect claims brought by servicemembers and military contractors. *In re 3M*, 2020 WL 5835311, at *4; *In re 3M*, 2020 WL 365617, at *6. This case is no different. As discussed above, the Defense Logistics Agency (the military's procurement agency) established reasonably precise specifications governing performance, testing, inspection, packaging, and labeling, with which the CAEv2 complied. Also, the government was adequately informed regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary authority in specifying and procuring the CAEv2 earplugs. The U.S. military was actively involved in discussions with Aearo in the development of the CAEv2 regarding its length and instructions for use. Aearo's engineers discussed the challenges and trade-offs in conforming the design of the CAEv2 to fit within the military's desired carrying cases and with its other equipment. This constitutes colorable evidence that the U.S. military generally exercised "discretionary authority over areas of significant federal interest such as military procurement," and the government contractor defense applies. *See In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 89-90 (2d Cir. 2008).

Even more, the government contractor defense applies to claims based on alleged defects in the instructions and label elements provided by the military. The military took on the responsibility for personally training recipients on proper use of the CAEv2 and drafted the training materials provided to servicemembers. The military also required 3M to ship CAEv2 destined for military use in bulk and without instructions to avoid interference with the military's instructions. Aearo also did not fail to inform the government of known dangers when it approved the specifications and instructions. First, there was no known danger Defendants were obligated to disclose. The CAEv2 met the

13

military's attenuation expectations for dual-ended earplugs with or without the flanges folded back. Second, to the extent there were "dangers," Aearo's engineers did inform the government of its testing results and the fitting issues created by the military's request to shorten the product and told the Army that some users would obtain a better fit if they folded back the opposing flanges before insertion. And third, the military was also fully aware of any issues as a result of its own testing and use of the CAEv2. In related cases involving CAEv2, the Eighth Circuit has held that this is sufficient to establish a colorable government contractor defense regarding failure-to-warn claims. *Graves*, 17 F.4th at 772 (reversing remand because "3M provided evidence that: the government required 3M to package CAEv2 earplugs provided to the military in bulk, without instructions; 3M complied; 3M warned the government that folding back the flanges of the outward end of the earplugs would ensure a proper fit; and the military developed and produced its own instructions that it provided military users on a wallet card.").

### 2. 3M Has a Colorable Combatant Activities Defense.

The "combatant activities defense" is a complete defense for claims arising out of combat activities. Although Congress waived sovereign immunity for tort claims against the United States and those acting on its behalf in the Federal Tort Claims Act, it excluded "claims arising out of combatant activities of the military or armed forces, or the Coast Guard, during time of war." 28 U.S.C. § 2680(j). The combatant activities exception has been applied to contractors to create a federal defense shielding manufacturers from tort claims arising from war. *See, e.g.*, *Saleh v. Titan Corp.*, 580 F.3d 1, 6 (D.C. Cir. 2009) (applying § 2680(j) exception to tort claims arising from treatment of inmates in military

prison in Iraq brought against private contractor); *Bentzlin v. Hughes Aircraft Co.*, 833 F. Supp. 1486, 1492 (C.D. Cal. 1993) ("The combatant activities exception generates a federal common law defense which immunizes manufacturers such as Hughes from state tort suits arising from war.") The combatant activities defense is broader than the government contractor defense under *Boyle* because it acts like "field preemption because it casts a[n] immunity net over any claim that *arises* out of combat activities." *Saleh*, 580 F.3d at 6 (emphasis in original; internal citation omitted).

Application of the defense has two elements: (1) the presence of combatant activities; and (2) that such activities occur during a time of war. The combatant activities element has been liberally construed and is not limited to the exertion of physical force. *See Johnson v. U.S.*, 170 F.2d 767, 770 (9th Cir. 1948). Rather, "activities both necessary to and in direct connection with actual hostilities" are included. *Id.* Ammunition supply, troop movement and logistical support, and holding prisoners of war have all qualified as combatant activities under the test. *See Aiello v. Kellogg, Brown & Root Servs.*, 751 F. Supp. 2d 698, 706 (S.D.N.Y. 2011).

Each factor is satisfied here. While the Complaint does not plead the details of Plaintiff's work with the military, Plaintiff does allege that participation in activities both necessary to and in direct connection with actual hostilities. (Complaint ¶¶ 8 – 11 (alleging plaintiff used CAEv2 while deployed with the military in Iraq).) Claims in such circumstances fall within the scope of the combatant activities defense. *See e.g.*, *Bentzlin*, 833 F. Supp. at 1492-95 (holding that claims brought against missile manufacture for

15

causing death of U.S. soldiers as a result of alleged product defect were barred by combatant activities defense).

Accordingly, 3M is immune from tort claims arising from Plaintiff's harm suffered while engaged in combatant activities. This defense separately supports federal question jurisdiction under Section 1442 and removal to this Court.

## II. REMOVAL IS ALSO PROPER BECAUSE PLAINTIFF'S CLAIMS AROSE IN PART ENCLAVES AT TERRITORIES SUBJECT TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES.

In addition, removal of this action is proper because Plaintiff's claims certainly arose, at least in part, at federal enclaves or other areas under the exclusive jurisdiction of the United States. To that extent, the claims are governed by federal law and are subject to this Court's federal question jurisdiction under 28 U.S.C. § 1331. Thus, this action is removable under 28 U.S.C. § 1441(a).

"A federal enclave is a portion of land over which the United States government exercises federal legislative jurisdiction." *Brookhaven Sci. Assocs., LLC v. Donaldson*, No. 04 Civ. 4013(LAP), 2007 WL 2319141, at *5 (S.D.N.Y. Aug. 9, 2007) (internal quotation and citation omitted). The Constitution confers on Congress the power "[t]o exercise exclusive legislation" over the District of Columbia "and to exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings." U.S. Const. art. I, § 8, cl. 17. "It has long been settled that where lands for such a purpose are purchased by the United States with the consent of the State legislature, the jurisdiction theretofore residing in the state passes, in virtue of the constitutional provision, to the

United States, thereby making the jurisdiction of the latter the sole jurisdiction." *Surplus Trading Co. v. Cook*, 281 U.S. 647, 652 (1930).

Because the United States exercises sole lawmaking authority over a federal enclave, the law applicable to that enclave is, by definition, federal law, although such federal law may incorporate state-law rules of decision. *See, e.g.*, *Mater v. Holley*, 200 F.2d 123, 124 (5th Cir. 1952) ("[A]ny law existing in territory over which the United States has 'exclusive' sovereignty must derive its authority and force from the United States and is for that reason federal law"); *accord Macomber v. Bose*, 401 F.2d 545, 546 (9th Cir. 1968) ("State law theretofore applicable within the [ceded] area was assimilated as federal law, to remain in effect until changed by Congress. Rights arising under such assimilated law, arise under federal law and are properly the subject of federal jurisdiction."); *Brookhaven Sci. Assocs.,* 2007 WL 2319141, at *5 ("[W]hen an area becomes a federal enclave, the state law in effect at the time of cession becomes federal law and is the applicable law unless Congress provides otherwise."). This is true even where a plaintiff pleads only state law claims. *Copeland*, 2020 WL 5748114, at *2 ("As a rule, where a complaint pleads only state law claims, a federal court does not have jurisdiction based on a federal defense," but the federal enclave doctrine is an "exception[] to the rule.").

Federal courts have federal-question jurisdiction under 28 U.S.C. § 1331 for actions involving tort claims that arise on areas under the exclusive jurisdiction of the federal government. *See, e.g.*, *Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998) (movant properly removed case to federal court when case was removed based on movant's status as a "person acting under" a federal officer, and status of the Air Force base as a

federal enclave). It follows that such actions, if originally filed in state court, may be removed to federal court under 28 U.S.C. § 1441(a). *See, e.g.*, *Allison v. Boeing Laser Tech. Servs.*, 689 F.3d 1234, 1236 (10th Cir. 2012) (affirming grant of summary judgment on state employment law claims as barred by federal enclave doctrine after removal from state court).

While Plaintiff's Complaint does not specifically identify each U.S. military facility where Plaintiff was issued and used CAEv2 and allegedly suffered hearing damage, one or more of these facilities undoubtedly qualifies as a federal enclave or is under the exclusive jurisdiction of the federal government. *See Jamil v. Workforce Res., LLC*, Case No.: 18-CV-27-JLS (NLS), 2018 WL 2298119, at *2 (S.D. Cal. May 21, 2018) (inferring from Complaint that some of the alleged events must have occurred at Marine Corps base, a federal enclave, and denying motion to remand).

Additionally, Plaintiff alleges that he used the CAEv2 while deployed with the military in Iraq. During some or all of the period Plaintiff alleges he used the CAEv2 in Iraq, the United States, in conjunction with its military partners, exercised exclusive sovereignty over territory. *See, e.g.*, Coalition Provisional Authority Order Number 17 (Revised) (signed on June 27, 2004 by L. Paul Bremer, U.S. Ambassador and CPA Administrator) (agreeing that the Multinational Force in Iraq, of which the United States was part, had "exclusive control and authority" over the "headquarters, camps or other premises [used by the Multinational Force]").

This Court has subject matter jurisdiction over Plaintiff's claims and removal is proper under 28 U.S.C. § 1441(a).

## CONCLUSION

For all the foregoing reasons, 3M hereby removes this action from the Fourth Judicial District Court of Minnesota, Hennepin County, to this Court. As noted above, co-defendant Aearo Technologies LLC consents to this removal.

Dated: April 14, 2022                                    Respectfully submitted,

*s/ Benjamin W. Hulse*
Benjamin W. Hulse (MN #0390952)
Gene Hummel (MN #0398239)
NORTON ROSE FULBRIGHT
60 South Sixth Street, Suite 3100
Minneapolis, MN 55402
Phone: (612) 321-2800
Email: ben.hulse@nortonrosefulbright.com
            Gene.hummel@nortonrosefulbright.com

**Counsel for Defendants 3M Company and Aearo Technologies LLC**
